## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

CYNTHIA D. FREEMAN, )
)
Plaintiff, )
v. ) No. 1:17CV211 RLW
)
NANCY BERRYHILL, )
Acting Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) and 1383(c)(3) for judicial review of the

Commissioner of Social Security's final decision denying Plaintiff Cynthia D. Freeman's

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

("the Act") and for Supplemental Security Income ("SSI") under Title XVI of the Act. Because

the Appeals Council denied Plaintiff's Request for Review, the decision by the Administrative

Law Judge ("ALJ") is the final decision of the Commissioner. For the reasons set forth below,

the Court affirms the decision of the Commissioner.

### I. Procedural History

Plaintiff protectively filed an application for DIB on December 3, 2014 and for SSI on

February 12, 2015. In both applications, she alleged disability beginning September 23, 2013.

(Tr. 27, 171, 178) Plaintiff's claims were denied on March 20, 2015 (Tr. 111-15), and she filed a

request for a hearing before an ALJ (Tr. 119). On February 6, 2017, Plaintiff testified at a

hearing before the ALJ. (Tr. 44-73) At the hearing, Plaintiff amended her alleged onset date of

disability to December 1, 2013. (Tr. 197) In a decision dated March 15, 2017, the ALJ

determined Plaintiff had not been under a disability from September 23, 2013 through the date of

the decision. (Tr. 24-39) On November 21, 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4) The Appeals Council specifically noted it did not consider the additional medical evidence Plaintiff submitted because it found such evidence did not relate to the time period at issue.[1] (Tr. 2) Accordingly, the Appeals Council found that Plaintiff's reasons and additional medical evidence did not provide a basis for changing the ALJ's decision. (Tr. 1) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the February 6, 2017 hearing before the ALJ, Plaintiff appeared with counsel. Plaintiff testified she had recently turned 50 years old and was a widow. She lives by herself in a one-story house, which she rents. She is approximately five feet tall and weighs approximately 180 pounds. Her kids drove her to the hearing in Cape Girardeau, but she has a driver's license and is capable of driving herself such as to the store and doctor's appointments. Plaintiff did not graduate high school but has earned a GED. She testified that her only source of income was her boyfriend who works out of town most of the time. (Tr. 51-54)

Plaintiff testified she had not worked since November 2013 and her counsel confirmed they would amend her initial alleged onset date of September 23, 2013 to December 1, 2013. (Tr. 54-55, 197) The ALJ noted that Plaintiff bounced around from various jobs during the course of the previous 15 years. For example, she worked for the temp company Kelly Services

---

[1] These records are by Johanna Rosenthal, M.D., from Southeast Health and dated April 26, 2017 through May 2, 2017. "In the context of judicial review of a decision of the Commissioner regarding SSI disability benefits, evidence outside the administrative record generally is precluded from consideration by the court." *Baker v. Barnhart*, 457 F.3d 882, 891 (8th Cir. 2006). If a claimant presents new evidence related to his or her claims, a court may remand the case to the Commissioner. "Remand is appropriate only upon a showing by the claimant 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (quoting 42 U.S.C. § 405(g)). "To be considered material, the new evidence must be 'non-cumulative, relevant, and probative of the claimant's condition *for the time period for which benefits were denied*.'" *Id.* (emphasis added) (quoting *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993)). Despite referencing these records numerous times in her brief in support, Plaintiff never engaged in an analysis regarding the materiality of these records on her claim. Consequently, the Court does not discuss those records in this Memorandum and Order.

in 2005 where she worked in multiple temp positions. She also worked part-time for the Fraternal Order of Eagles where the most she made was about $7,700 plus tips. Starting in 2011, Plaintiff worked as a cashier and kitchen manager at the Southeast Co-Op, which was a gas station and restaurant. In addition to supervising people in the kitchen, Plaintiff also worked the cash register, helped out front when needed, and did most or all of the stocking. (Tr. 55-58)

The ALJ then turned the questioning towards Plaintiff's medical issues. Plaintiff said she is unable to lift, write, or bend and she "[b]ascially can't do hardly any activities." Starting with her purported neck pain, she testified she has had problems with her neck "all along." Plaintiff explained she thought her hand problems were caused by her neck issues but her claims were dismissed when she had carpal tunnel surgery. She has had two surgeries on her neck: the first surgery was around 2003 and the second surgery was in April of 2015 or 2016. Both surgeries were fusions but at different levels. Plaintiff said she did not get any relief from the surgeries and within a few months of recovery she felt like she did before the surgeries. In addition to having trouble lifting things, Plaintiff also said her neck problems make it hard to breathe. She can no longer take baths like she used to and can now only take showers with difficulty. She does not cook anymore, mainly just snacks. She does not get much household cleaning done before she has to lie down. Doing laundry is hard because bending over hurts her back. (Tr. 58-62)

Turning towards her carpal tunnel, Plaintiff testified she began having problems while working at Southeast Co-Op. She gradually noticed she was unable to feel the money at the register and could hardly lift anything. Plaintiff underwent surgery on her left hand in January 2014 and her right hand a few months later. Again, Plaintiff said these surgeries did not provide any benefit.

Q      All right. Did you get some relief with those surgeries?  Did they give you some benefit?

A      No.  No, they didn't.

Q      Even for a little while at all?

A      No.

Q      You just pretty much again right when you recovered, the problems came right back?

A      Yea.

Plaintiff testified her hands "cripple up on [her]" and throb.  Her arms will also cramp up if she tries to do something, which causes her to have to rest before trying again.  Plaintiff has trouble doing "normal things," such as cutting up food.  (Tr. 62-63)

In addition to her neck and carpal tunnel, Plaintiff testified about her back and leg problems.  Her legs are in pain all the time, her knees go out on her, and her hip hurts constantly. Plaintiff has sought medical treatment for these problems.  MRIs have shown lower 4 and 5 disc bulges that were inoperable.  Plaintiff also said she has deteriorated disc disease and arthritis. When she had surgery performed on her neck, the surgeon said her spine was bruised and he was not sure if it would ever heal.  (Tr. 63-64)

Plaintiff's counsel had previously indicated in his opening statement that Plaintiff would testify regarding one specific document in the record from a nurse practitioner against whom Plaintiff has filed a complaint with the supervising physician.  (Tr. 49)  Plaintiff testified that this nurse practitioner indicated "they couldn't do anything with my back until they got done with my neck."  The nurse practitioner then ordered MRIs, but Plaintiff said she never heard back.  At the end of that month (October), Plaintiff called and the nurse practitioner's assistant told Plaintiff that her insurance provider denied the MRIs and that the nurse practitioner would need to reinstate the order.  Plaintiff said she never heard back until she called the following month (November).  This time, Plaintiff says the nurse practitioner allegedly said she did not believe

Plaintiff needed the MRIs. Plaintiff questioned the change in recommendation which lead to her getting upset and exchanging words with the nurse practitioner. Plaintiff then called the supervising physician to complain, and the supervising physician reissued the MRI orders. Plaintiff testified that when she went back to the nurse practitioner's office, she was dismissed. (Tr. 64-66)

Plaintiff further testified that when reviewing her medical records, she noticed false information in the records from the nurse practitioner. For example, Plaintiff objects to a comment that she was "more worried about [her] disability than [she] was getting treatment." Further, the records state Plaintiff dropped them but she maintains the nurse practitioner dropped her. Plaintiff said she had since filed a complaint with the supervising physician but had yet to receive a response. (Tr. 66-67)

Plaintiff's counsel next addressed Plaintiff's loss of bladder control. She testified that she has had bladder control problems since 2014 or 2015 and her current medication causes constipation. Plaintiff said she has to use the restroom more than 10 times a day. (Tr. 67-68)

Plaintiff testified she did not believe she could work at a station/restaurant similar to her job at Southeast Co-Op because she would have to take extra breaks to use the restroom. She further stated she would miss many days of work unplanned. When asked to estimate how often in a month, she answered: "In a month? I'd probably be calling off all the time because I couldn't do -- it would hurt so bad." (Tr. 68-69)

A vocational expert ("VE") also testified at the hearing. The VE classified Plaintiff's past work as a kitchen manager and a storekeeper in the Dictionary of Occupational Titles ("DOT"). The ALJ considered a composite of the two positions to be an accurate representation of Plaintiff's past work experience. The ALJ asked the VE to assume a hypothetical individual

of Plaintiff's age, education, and work history with the following range of light work: no climbing of ladders, ropes, or scaffolds; no crawling; no overheard reaching with either upper extremity; frequent reaching in all other directions; and frequent handling and fingering. The VE testified that such a hypothetical individual could perform the duties of a storekeeper but not the duties of a kitchen manger. The ALJ found such limitations would eliminate the job since the hypothetical called for a composite of the two. The ALJ next asked if there were other jobs available at that light level in the national economy. The VE testified that such a hypothetical individual could work as a light, unskilled cleaner or housekeeper, of which there are at least 300,000 jobs in the national economy, and a light, unskilled laundry worker, of which there are at least 200,000 jobs in the national economy. The ALJ asked the VE to consider the same hypothetical individual but with occasional reaching in all directions and occasional handling and fingering. The VE said those listed jobs would not be available for such a hypothetical individual. When asked by the ALJ if there would be jobs at the light or sedentary level, the VE said there would be no applicable jobs. The ALJ next asked the VE if a hypothetical individual could miss work or leave early at least three times per week on a continuing and ongoing basis could maintain employment in the national economy without a special accommodation. The VE testified such an individual could not maintain employment. (Tr. 69-71)

Plaintiff's counsel then asked the VE if the kitchen manager position as described is a specific vocational preparation ("SVP") rating 7. The VE testified that the work Plaintiff performed at Southeast Co-Op may not have been an SVP of 7 because it was a small kitchen, but a kitchen manager as typically performed is an SVP of 7 based on the type of work performed. The ALJ then opined that a kitchen manager is supervising cooks while also serving as a cook so would have an SVP of 6 or 7. (Tr. 71-72)

### III. Medical Evidence

Plaintiff claims she is disabled due to chronic pain throughout her body, specifically pain in her arms, neck, back, hips, shoulders and legs. Plaintiff explicitly notes in her brief in support of the Complaint that she "basically agrees with the factual findings of the ALJ," but she raises multiple arguments related to the ALJ's consideration or alleged lack of consideration of specific medical evidence and her subjective symptoms. (ECF No. 10, at 2) These specific arguments are addressed fully below, but the Court nonetheless will detail some of Plaintiff's voluminous medical records.

A report dated October 30, 2013 by orthopedic surgeon Rickey Lents, M.D., notes Plaintiff had a history of cervical fusion and complaints of hand pain that worsens with activity. Plaintiff exhibited tenderness, positive Tinel's sign bilaterally, and only mildly positive Phalen sign, but there was no muscle atrophy. Dr. Lents diagnosed Plaintiff with bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome. That day, Dr. Lents injected both of Plaintiff's wrists with Depo-Medrol and Lidocaine and continued to instruct Plaintiff to wear splints at night. On January 15, 2014, Dr. Lents performed left carpal and cubital tunnel release. Notes from a follow-up examination on March 6, 2014 indicates she was doing very well with improvements in grip and range of motion and that Dr. Lents was going to try sending her back to work at full duty. When Dr. Lents saw Plaintiff two weeks later, she had continued to improve with less pain and numbness in her left hand but her right hand was symptomatic so he scheduled surgery. On April 2, 2014, Dr. Lents performed right carpal and cubital tunnel release. (Tr. 281-92)

Neurologist Daniel Phillips, M.D., saw Plaintiff in September 2014 and noted Plaintiff reported she had obtained no relief from her carpal tunnel surgeries. Plaintiff described constant

throbbing aching cervical brachial pain, thoracic and low back pain, as well as heaviness in her arms and global hand numbness. Physical examination, however, revealed few significant abnormalities. Dr. Phillips noted localized neck pain on cervical range of motion but he characterized it as non-radiating. Adson maneuvers were negative there were no Tinel signs at the cubital tunnels and condylar grooves. Dr. Phillips also noted no spontaneous tenderness over the medial or lateral epicondyles or over the radial tunnels or pronators. The carpal tunnel sites, motor testing, and soft touch were also unremarkable, and reflexes were 2+ and symmetrical at the brachialradalii, biceps, and triceps. Dr. Phillips referenced a NCVs that revealed values within the normal range and showed improvement in the ulnar nerve across the elbows with very mild left-sided residual. Electromyography (EMG) further demonstrated evidence of only mild chronic cervical radiculopathy, predominantly at C6-7 and borderline at C5-6. (Tr. 298-99)

On January 20, 2015, Plaintiff was admitted to the ER at St. Francis Medical Center after complaining of difficulty moving and "nerve damage somewhere." (Tr. 418) Chest x-rays that same day revealed postsurgical changes involving the cervical spine and, although impressions included chronic obstructive pulmonary disease ("COPD"), lungs were symmetrically hyperinflated without infiltrate, effusion, or vascular congestion. (Tr. 340) A CT scan of the cervical spine showed previous fusion at the C5-6 level but no other abnormalities and noted normal alignment. (Tr. 343) The final diagnoses were myalgia and arthralgia. (Tr. 423)

On March 3, 2015, a specialist in occupational medicine, Shawn Berkin, D.O., performed an independent medical examination of Plaintiff. Dr. Berkin recommended Plaintiff should avoid forceful gripping, squeezing, pinching, pulling, twisting, or reaching with her hands for extended periods. He further suggested she should avoid torque-like or high impact stresses to her hands. (Tr. 305-16)

Internal medicine specialist Barry Burchett, M.D., performed a consultative examination of Plaintiff on March 9, 2015. Her chief complaints were her hands, lower back, and that she could not walk. Dr. Burchett noted Plaintiff ambulated with a normal gait, which was not unsteady, lurching, or unpredictable. Further findings included negative straight leg raising and no spasms or tenderness in Plaintiff's spine. Grip strength was reduced at 4/5 and there was no evidence of atrophy. Plaintiff exhibited negative Tinel signs, no problems picking up a coin with either hand, and there was full range of motion of the wrists. Sensory modalities were well preserved including light touch, pinprick, and vibration. The biceps, triceps, brachioradialis, patellar and Achilles deep tendon reflexes were symmetrical and graded normally at +2/4. Plaintiff stopped squatting at 50 degrees of knee flexion citing back pain but Dr. Burchett notes she was able to perform tandem gait and range of motion of all joints was full. Dr. Burchett diagnosed Plaintiff with persistent carpal tunnel syndrome, chronic low back pain, and status post cervical fusion. (Tr. 325-28)

Plaintiff's primary care physician, Edward Doyle, M.D., examined her on April 24, 2015 for complaints of severe low back pain, inability to use her hands, and problems walking as well as bladder problems. Dr. Doyle's notes show Plaintiff exhibited crepitus of the cervical spine, scattered rhonchi with moist non-productive cough, weakness, and bladder problems. Specifically, examination of her spine showed it was normal with no deformity and trigger point tenderness over C2-T2. Plaintiff stated the pain from her neck was radiating to her shoulders. Inspection of the lumbosacral spine was also normal other than trigger point tenderness over Tl 0 to L5-S 1 radiating to her hips and down her legs to her knees. The exam notes show lying straight leg raise was positive at 25 degrees bilaterally and Fabere test was positive bilaterally. Dr. Doyle administered injections to Plaintiff's left and right gluteus and discussed the hazards

of smoking, the importance of regular exercise (specifically instructing her to walk 30 minutes per day), and prescribing a low cholesterol/fat diet. Dr. Doyle further recommended Plaintiff wear cock-up wrist splints, avoid repetitive activities with her hand, and to modify the use of her hands and wrists to reduce symptoms until her pain improved and then she was to wear them only at night. (Tr. 436-42)

Plaintiff saw Dr. Doyle again on May 5, 2015, complaining that Vesicare increased her urination and improved polyarthralgia but not her pain. Physical examination revealed few significant abnormalities. She demonstrated full range of motion of all joints and neurologic examination showed no focal deficits, and her cranial nerves were grossly intact with normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. 458)

On June 23, 2015, Plaintiff underwent an MRI. The lumbar MRI showed minor disc bulges and mild degenerative disc disease without central canal stenosis. The cervical MRI showed small broad-based central disc protrusion at C3-4 that mildly indented the cervical cord producing mild central canal stenosis. A posterior disc osteophyte complex at C4-5 caused moderate central disc protrusion with moderate indentation of the cervical cord and moderately severe central canal stenosis. Further, the thoracic MRI revealed only mild degenerative spondylosis with some hypertrophy and foraminal stenosis but no disc herniations. (Tr. 381-88)

Records from a September 29, 2015 examination signed by nurse practitioner Debra Alexander, A.P.R.N., and Kevin Vaught, M.D., noted Plaintiff demonstrated full range of motion of the cervical spine, although she was limited in right rotation and left rotation, and full inflexion and extension. (Tr. 655-56)

On November 17, 2015, Plaintiff saw Sarah Oliver, M.P.A.A., the physician assistant for neurosurgeon Brandon Scott, D.O. Plaintiff characterized her neck pain as only 2 on a 1-10

scale of severity and reported unsteady gait with multiple falls per day. (Tr. 872) That same day, Plaintiff also reported her pain as 8/10. (Tr. 730) Plaintiff reported that her lower extremity problems improved with Gabapentin. Nurse Oliver noted muscle strength 5/5 in bilateral shoulder abductors, 5/5 bilateral biceps and triceps, and only mildly decreased hand grip to 4/5 bilaterally. Further, Nurse Oliver explained to Plaintiff that her unsteady gait and possibly her hand symptoms originate from cord myelomalacia. Nurse Oliver told the claimant she should not perform any strenuous activities or lifting more than 15 pounds, to which Plaintiff agreed. (Tr. 732-33)

On December 9, 2015, Plaintiff was treated at Cape Spine and Neurosurgery. That day, she characterized her pain as only 5/10 and the report again indicates that she was functioning independently. While the report indicates Plaintiff's cervicalgia was chronic, it was intermittent. Specifically, Plaintiff reported that her pain was localized in the cervical spine and that it did not radiate and denied weakness. Her body mass index ("BMI") was 35.9. The Diagnosis was cervical spinal stenosis, degenerative disc disease, and bulging disc. (Tr. 401-03) Plaintiff returned to Cape Spine and Neurosurgery on March 18, 2016 and described her pain as 7/10. (Tr. 869)

On April 4, 2015, Dr. Scott performed anterior cervical discectomy and fusion at C4-5. (Tr. 882-83) Cervical x-rays dated May 12, 2016 showed only postoperative changes with good positioning of the hardware at C4-5 and C5-6. (Tr. 934) On June 29, 2016, Nurse Oliver characterized Plaintiff's complaints of cervicalgia as an acute exacerbation, which is not consistent with allegations of constant pain. Cervical spine x-rays showed proper placement of the hardware without foraminal encroachment or shifting. The sole abnormality was

anterollsthesis of C3 on C4 mesuring 1.8 mm, which was most pronounced in the flexion position and reduced in the neutral and extension positions. (Tr. 916-19; 934-35)

Plaintiff reported to the Advanced Pain Center on July 19, 2016 and complained that her neck pain radiated down the upper extremities to her hands and that her lumbar pain radiated to the hip areas. Neuromuscular examination revealed positive Hoffman sign but negative Spurling with normal muscle strength and sensation. Examination of the thoracic spine was normal. Similarly, few abnormalities were noted in the lumbosacral spine with moderate tenderness in the center of the spine and around facet joints at L3-5 but muscle strength was normal as were reflexes, sensation, and Spurling test. (Tr. 983, 986-87)

On August 2, 2016, pain management specialist Alfredo Romero, M.D., prescribed hydrocodone-acetaminophen 5/325 (Norco), Gabapentin, and Mobic. Dr. Romero increased Norco to 7.5-325 mg and continued the claimant on her other medications. (Tr. 978-81) On September 13, 2016, Plaintiff told Dr. Romero none of her medications were working and she reported lumbar pain that was greater than her neck pain and radiating down her bilateral lower extremities. Dr. Romero noted her range of motion of the cervical spine was within normal limits with positive Hoffman signs but normal muscle strength, sensation, and negative Spurling. Thoracic spine revealed no tenderness and range of motion was within normal limits. There was moderate tenderness to palpation in the center of the lumbosacral spine and around the facet joints but muscle strength was normal in both lower extremities and sensation was intact. Inspection of the upper and lower extremities was normal as were cranial nerves, motor system, sensory system, and reflexes. (Tr. 968-69)

On September 28, 2016, Plaintiff complained of ongoing numbness and tingling in the upper extremities. She thought surgery failed but she admitted her gait was back to baseline and

her cervicalgia had improved. The report further indicates Plaintiff's hand problems were not related to her recent surgery and Dr. Scott released her from his care. Nurse Oliver noted that Plaintiff ambulated without a limp, transitioned from a seated to standing position without pain, and she reported she had recently made a trip to Memphis where she walked up and down Beale Street. According to Nurse Oliver, none of these activities was consistent with Plaintiff's reported low back pain radiating to the right lower extremity. The report indicates Plaintiff reported significant back problems with radiation, but such symptoms did not match her MRI and commented she appeared more interested in application for disability than in any treatment options. (Tr. 884-86)

On December 6, 2016, Dr. Romero discontinued the prescription for Keppra because of side effects but Plaintiff admitted Gabapentin had helped with her symptoms and did not cause side effects. (Tr. 955) On January 3, 2017, Dr. Romero noted Plaintiff reported her pain level was 9/10 but that this was not apparent in her demeanor. (Tr. 947)

## IV. The ALJ's Determination

In a decision dated March 15, 2017, the ALJ found that Plaintiff met the insured status requirements of the Act through September 30, 2019. Plaintiff had not engaged in substantial gainful activity since the initial alleged onset date of September 23, 2013.[2] The ALJ further found that Plaintiff had the following severe impairments: status post cervical fusion and carpal tunnel release surgeries and obesity. The ALJ also found Plaintiff had the following medically determinable impairments that were either non-severe or that did not persist 12 continuous months: asthma/COPD, lumbar degenerative disc, and hip or leg problems. While Plaintiff did

---

[2] As explained above, Plaintiff amended the alleged onset date to December 1, 2013 at the hearing before the ALJ. (Tr. 54-55, 197) Therefore, the ALJ's decision erroneously used the initial alleged onset date. This error is immaterial and has not prejudiced Plaintiff as the amended date is later than the initial date – i.e., because the ALJ found Plaintiff has not engaged in substantial gainful activity since September 23, 2013, the ALJ also must have found she has not engaged in substantial gainful activity since December 1, 2013.

have severe impairments, the ALJ concluded she did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 29-30)

After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light work. These limitations include avoiding climbing of ladders, ropes, or scaffolds; avoiding crawling and overhead reaching with the upper extremities, although she is able to reach in all other directions frequently; frequent handling and fingering. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. (Tr. 31-32)

In making this finding, the ALJ gave significant weight to Dr. Lents's March 2014 report in which Plaintiff indicated she was doing very well with improvements in grip and range of motion and Dr. Lents stated that he was going to try sending her back to work at full duty. The ALJ also gave great weight to the opinions and treatment of Plaintiff's primary care physician, Dr. Doyle, who, in April 2015, discussed the importance of physical activity with Plaintiff. Specifically, Dr. Doyle recommended she walk 30 minutes per day. The ALJ found it unlikely Dr. Doyle would have made this recommendation if he thought Plaintiff was experiencing the degree of walking difficulty she reported at that time or that this activity would aggravate any medical condition. The ALJ further considered Dr. Doyle's recommendation for Plaintiff to wear cock-up wrist splints, avoid repetitive activities with her hand, and to modify the use of her

hands and wrists to reduce symptoms. Dr. Doyle nonetheless indicated this was only until her pain improved and then she was to wear them only at night. (Tr. 32-33)

The ALJ further notes that there were conflicting reports of Plaintiff's degree of neck pain. In one record from November 17, 2015, Plaintiff characterized her neck pain as 2 on a 1-10 scale of severity. In another record from the same date, she reported her pain as 8 out of 10. On December 9, 2015, Plaintiff characterized her pain as 5/10 and reported that her pain was localized in the cervical spine and that it did not radiate. She later described her pain as 7/10 on March 18, 2016. On January 3, 2017, Dr. Romero noted that Plaintiff reported her pain level was 9/10 but that this was not apparent in her demeanor. (Tr. 34-36)

The ALJ further explained how he considered Plaintiff's obesity in combination with her other impairments in determining her functional limitations. While acknowledges that her BMI has remained in the mid-30s throughout the time period at issue (which is above the threshold for an obesity diagnosis of 30), the ALJ noted Plaintiff's weight could cause some limitations with mobility and stamina. Such considerations are reflected in the ALJ's reducing her exertional level to light with additional postural restrictions. (Tr. 36-37)

The ALJ notes that, despite Plaintiff's testimony that she had experienced no improvement in her hand symptoms after carpal tunnel surgery, she did not consistently complain of hand pain during periods that she was primarily seeking treatment for spinal pain. Further, there was a short period of time during which Plaintiff complained of bladder control problems but there is no indication in the record that the problem was ongoing. (Tr. 37)

The ALJ also gave great weight to the opinions of Dr. Berkin and based his decision to limit Plaintiff to frequent use of the hands for grasping and fingering on Dr. Berkin's assessment that Plaintiff should avoid lifting or working with her arms above shoulder level and that she is

limited to lifting 30 pounds occasionally and 20 pounds frequently. The ALJ further concluded there is little evidence in the record to support a need for frequent breaks. (Tr. 37)

Finally, the ALJ gave significant weight to the analysis of the vocational rehabilitation counselor, Timothy Lalk. (*See* Tr. 344-64) While noting Lalk is a non-medical source, the ALJ found that his assessment was consistent with the medical evidence contained in the record. Specifically, he indicated that based on Plaintiff's own report and not the objective evidence, he would limit her to work involving limited hand activities below shoulder level. Lalk further suggested that, based on the restrictions given by Dr. Lents and Dr. Berkin, he believed Plaintiff could perform occupations such as counter clerk, cashier, unarmed security guard, information clerk, and a variety of customer service positions. The ALJ, however, gave little weight to Lalk's statement that, if Plaintiff's complaints were to be believed, she would be unable to perform even sedentary work due to her purported need to take excessive breaks or maintain an acceptable work pace because the evidence does not support such a need. As reiterated elsewhere, Plaintiff reported her main problem is difficulty walking but the ALJ found there was a lack of objective evidence to support difficulties with ambulation and there is little evidence that the claimant used any assistive device during the time period at issue. (Tr. 37)

Based on the VE's testimony and in consideration of Plaintiff's relatively younger age, high school education, work experience, and RFC, the ALJ concluded that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. These jobs included cleaner-housekeeper and laundry worker. Therefore, the ALJ concluded that Plaintiff had not been under a disability from September 23, 2013 through the date of the decision and was not disabled. (Tr. 38-39)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[3] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will

---

[3] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her brief in support of the Complaint, Plaintiff raises three arguments. First, she asserts that the ALJ erred in finding that her back condition was not severe. Second, Plaintiff argues the ALJ erred in failing to give proper weight to her complaints of hand numbness, tingling, and pain. Third, she claims the ALJ erred by failing to give adequate weight to her cervical condition and mischaracterized the evidence. Defendant responds that the ALJ properly identified Plaintiff's non-severe impairments. Further, Defendant argues that substantial evidence supports the ALJ's RFC determination and that the ALJ properly found that Plaintiff could perform other work.

### (a) The ALJ's determination that Plaintiff's lumbar spine condition was non-severe

Plaintiff argues the ALJ erroneously determined that her lumbar spine condition was non-severe. She cites to numerous pages in the record that contain references to her complaints of lower back pain. (Tr. 295, 298, 311, 328, 363, 370, 401, 414, 947) Plaintiff also asserts she had objective signs of lower back pain. For example, the June 23, 2015 MRI showed evidence of disc bulges. (Tr. 383) Defendant, on the other hand, argues that the overwhelming evidence of Plaintiff's treatment notes supports the ALJ's finding that Plaintiff's alleged lumbar disc disease does not cause more than a minimal vocationally relevant limitation, and is therefore non-severe. Furthermore, Defendant asserts the ALJ nonetheless considered Plaintiff's non-severe lumbar impairment in his RFC determination by noting limitations that account for her lower back pain.

RFC is a medical question, and the ALJ's assessment must be supported by substantial evidence. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is

defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1).

> Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996). The ALJ has the responsibility of determining a claimant's RFC "based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Sieveking v. Astrue*, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008) (quoting SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996)). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Tinervia v. Astrue*, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); *see also Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace'"). In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). The ALJ may not rely upon his or her own inferences. *Id.* at 858.

Here, in finding that Plaintiff's lumbar degenerative disc was a non-severe impairment, the ALJ noted: "The claimant alleged serious problems with her back, hips, and legs. However, aside from reports of back pain, the only thing in the medical evidence of record is a lumbar imaging study that showed no significant abnormalities." (Tr. 30) He then cites the MRI performed on June 23, 2015. (Tr. 383) Plaintiff argues the ALJ "downplayed" the significance of that particular MRI and suggests that the ALJ "incorrectly stated that the only abnormal finding was mild degenerative disc disease. Actually, the MRI showed disc bulges with possible encroachment on the Left 4 nerve root and multilevel foraminal stenosis." (ECF No. 10, at 6) (citations to the record omitted) Further, Plaintiff objects to the ALJ's comment that "[t]here is little evidence that [Plaintiff's] back pain was greater than her neck pain until she presented to Advanced Pain Center on July 19, 2016." (Tr. 35) According to Plaintiff, her degree of back pain relative to her neck pain is irrelevant to the question of whether her back pain presented a severe impairment: "Her low back hurt even though her neck pain was worse." (ECF No. 10, at 6)

The question a reviewing court must answer is not whether *any* evidence exists in support of a claimant's purported disability; rather, the inquiry is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g). A court may not reverse an ALJ's decision that is supported by substantial evidence "even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). The Court finds the ALJ's determination that Plaintiff's lower back problems were a non-severe impairment is supported by substantial evidence. This is true even if substantial evidence would also support Plaintiff's assertion that her numerous reports of lower back pain. While Plaintiff correctly points to some of the stated findings of the

June 23, 2015 MRI concerning specific instances of disc bulges, the ALJ nonetheless is correct that the explicit impressions of the MRI found "[m]ild lumbar degenerative disc disease without central canal stenosis" and "[n]o lumbar disc herniations." (Tr. 383) Such impressions support the ALJ's conclusion regarding the severity of Plaintiff's lower back problems.

Other medical evidence supports the ALJ's determination regarding Plaintiff's lower back problems. A January 20, 2015 CT scan of her lumbar spine showed normal alignment with no pars defect and intact spinous progresses. (Tr. 340) Dr. Burchett noted in March 2015 that Plaintiff had a negative straight leg raise, no spasms, and no tenderness in her spine. (Tr. 327-28) X-rays of her lumbar spine dated June 23, 2015 were normal. (Tr. 386) An examination on July 19, 2016, also showed normal muscle strength and sensation in Plaintiff's lumbar spine. (Tr. 987)

Furthermore, the ALJ thoroughly explained his decision regarding Plaintiff's non-severe impairments including which medical records and opinions were given weight and any inconsistencies reflected in those records and Plaintiff's subjective symptoms. Nevertheless, the ALJ notes that he took Plaintiff's lower back problems into account when he determined Plaintiff's RFC and limited her to light work, which is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. 404.1567(b), 416.967(b). As explained above, the ALJ "accept[ed] Dr. Berkin's assessment that [Plaintiff] should avoid lifting or working with her arms above shoulder level and that she is limited to lifting 30 pounds occasionally and 20 pounds frequently." (Tr. 37) Accordingly, the Court does not find reversible error on this point.

### *(b) The ALJ's consideration of Plaintiff's subjective complaints of hand numbness, tingling, and pain*

Plaintiff next argues the ALJ erroneously determined she could be limited to "frequent" use of her hands for grasping and fingering. She notes that the Social Security Administration defines "frequent" as "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *6 (Soc. Sec. Admin. Jan. 1, 1983)). Plaintiff asserts her testimony regarding pain in her hands calls for a finding of less than frequent use of her hands. She further argues the ALJ improperly picked and chose what medical evidence to rely on in reaching his decision concerning her hand pain. Defendant responds that the ALJ found her alleged subjective symptoms were not consistent with treatment notes contained in the record.

The Court finds that the ALJ properly considered all the evidence in the record before him, which included Plaintiff's in-person testimony during the hearing about her subjective symptoms as required by SSR 16-3p, 2017 WL 5180304, at *10 (Soc. Sec. Admin. Oct. 25, 2017)). "As is often true in disability cases, the question [is] not whether [Plaintiff] was experiencing pain, but rather the severity of her pain." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "An ALJ has a statutory duty to assess the credibility of the claimant, and thus, an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." *Crawford v. Colvin*, 809 F.3d 404, 410 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 589-90 (8th Cir. 2004)). Here, treatment notes from multiple physicians do not reflect the same degree of severity of hand pain as Plaintiff testified post her January 2014 carpal tunnel surgeries. For example, Dr. Phillips noted in September 2014 that there were no spontaneous Tinel or Phalen signs at the carpal tunnels. Dr. Burchett observed in March 2015 that there was no swelling, atrophy, redness, warmth, or tenderness in Plaintiff's hands; her hands could be fully extended; she could write

and pick up a coin with either hand without difficulty; and the range of motion of joints in all fingers was normal. (Tr. 327) Furthermore, despite Plaintiff's testimony that her surgeries provided no relief, Dr. Lents – who performed her carpal tunnel surgeries – commented in follow-up notes that she showed improvements with grip and motion within a few months after surgery and he returned her to full duty work in March 2014. (Tr. 288) Consequently, the Court finds that substantial evidence supports the ALJ's determination that "[Plaintiff's] the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 31)

### (c) The ALJ's consideration of evidence regarding Plaintiff's cervical spine condition

Plaintiff next argues the ALJ did not give adequate weight to evidence of her cervical spine condition when making his RFC determination. Rather, Plaintiff asserts evidence in the record supports limiting Plaintiff to no more than sedentary activities.

Plaintiff's argument is essentially that there is evidence supporting a finding of disability. However, as stated above, a court may not reverse an ALJ's decision that is supported by substantial evidence "even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Travis*, 477 F.3d at 1040. Plaintiff argues the ALJ "mischaracterized or ignored evidence favorable to a finding of deniability" and that "[m]ischaracterization of evidence may be grounds for reversal on substantial evidence grounds." The one case she cites to support this argument is *Goforth v. Berryhill*, No. 4:16-CV-00606 JMB, 2017 WL 1869783, at *6 (E.D. Mo. May 9, 2017). The court in *Goforth* found that the ALJ committed reversible error by mischaracterizing a physician's medical finding that the plaintiff's "medically diagnosed anxiety was non-severe" when the actual record showed the

physician found the plaintiff's anxiety *was severe*. *Id.* Here, Plaintiff has failed to cite to an example of the ALJ making a similar mischaracterization or misquote of a medical record.

Further, Plaintiff has failed to show the ALJ completely ignored evidence contrary to his determination. *See, e.g.*, *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004). "The ALJ is charged with the responsibility of resolving conflicts among medical opinions." *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Plaintiff has not presented a compelling reason for reversing the ALJ's decision regarding which medical opinions to give more weight. Therefore, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled under the Social Security Act and affirms the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this 27ᵗʰ day of March, 2019.

*Ronnie L. White*

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**